AO 242 (Rev. 09/17) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

FILED
Page 1

2022 MAR 23 AM 11: 31

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

Cameron Dean Bates
_____
*Petitioner*

v.

C. Lane,
Warden, FCC Coleman Low Prison,
(in her official capacity)
_____
*Respondent*
*(name of warden or authorized person having custody of petitioner)*

Case No. 5:22-cv-159- WFJ-PRL
*(Supplied by Clerk of Court)*

## PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

### Personal Information

1.  (a) Your full name: Cameron Dean Bates
    (b) Other names you have used: None
2.  Place of confinement:
    (a) Name of institution: Federal Correctional Complex-LOW (Coleman)
    (b) Address: PO Box 1031 (for inmates) / PO Box 1021 (for staff mail)
        Coleman, Florida 33521
    (c) Your identification number: Reg. No. 00407-104
3.  Are you currently being held on orders by:
    ☒ Federal authorities    ☐ State authorities    ☐ Other - explain:

4.  Are you currently:

    ☐ A pretrial detainee (waiting for trial on criminal charges)

    ☒ Serving a sentence (incarceration, parole, probation, etc.) after having been convicted of a crime

    If you are currently serving a sentence, provide:
    (a) Name and location of court that sentenced you: U.S. District Court, Southern
        District of Florida, Fort Pierce Division.
    (b) Docket number of criminal case: 2:12-CR-14054-KMM
    (c) Date of sentencing: 9/15/15 (resentencing date after re-trial.)

    ☐ Being held on an immigration charge

    ☐ Other *(explain)*: _____

### Decision or Action You Are Challenging

5.  What are you challenging in this petition:

    ☐ How your sentence is being carried out, calculated, or credited by prison or parole authorities (for example, revocation or calculation of good time credits)

BATES, CAMERON 00407104

AO 242 (Rev. 09/17)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

Page 2

❏ Pretrial detention

❏ Immigration detention

❏ Detainer

☒ The validity of your conviction or sentence as imposed (for example, sentence beyond the statutory
   maximum or improperly calculated under the sentencing guidelines)

❏ Disciplinary proceedings

❏ Other *(explain)*:

6.  Provide more information about the decision or action you are challenging:

    (a) Name and location of the agency or court:  U.S. District Court for the Southern Dist.
        of Florida, Ft. Pierce Division

    (b) Docket number, case number, or opinion number:  2:12-CR-14054-KMM

    (c) Decision or action you are challenging *(for disciplinary proceedings, specify the penalties imposed)*:

    1) Special Conditions of Supervised Release imposed with sentence are unconstitutional improper or/and
    violate statute;  2) Sentence was based, in whole or part, upon inaccurate/untrue data;  3) The
    conviction and by extension the sentence should have been precluded under Double Jeopardy.

    (d) Date of the decision or action:  9/15/15

### Your Earlier Challenges of the Decision or Action

7.  **First appeal**

    Did you appeal the decision, file a grievance, or seek an administrative remedy?

    ☒ Yes          ❏ No

    (a) If "Yes," provide:

        (1) Name of the authority, agency, or court:  U.S. Court of Appeals for the 11th Circuit

        (2) Date of filing:  Late 2012, early 2013.

        (3) Docket number, case number, or opinion number:  890 Fed. Appx. 882 (11th Cir. 2014)

        (4) Result:  Vacated and Remanded for new trial

        (5) Date of result:  Late 2014

        (6) Issues raised:  1) Improper jury voir dere; 2) Improper disclosure of unrelated
            sexual orientation of the defendant/jury bias;  4) improper time constraints.

    (b) If you answered "No," explain why you did not appeal:

8.  **Second appeal**

    After the first appeal, did you file a second appeal to a higher authority, agency, or court?

    ☒ Yes          ❏ No

BATES, CAMERON 00407104

AO 242 (Rev. 09/17) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

*Page 3*

(a) If "Yes," provide:  ✳NOTE:  This was a <u>second direct appeal</u> for the <u>second trial</u>

    (1) Name of the authority, agency, or court:  U.S. Court of Appeals for the

11th Circuit

    (2) Date of filing: Late 2015

    (3) Docket number, case number, or opinion number:  665 Fex.Appx 819 (11th Cir. 2016)

    (4) Result:  Affirmed.

    (5) Date of result:  11/29/2016

    (6) Issues raised:  1) Use of improper hearsay evidence;  2) prejudicial,

improper, and false characterization of the Defendant by the Government

(b) If you answered "No," explain why you did not file a second appeal:

9.  **Third appeal**

After the second appeal, did you file a third appeal to a higher authority, agency, or court?

☐ Yes  ☒ No

(a) If "Yes," provide:

    (1) Name of the authority, agency, or court:

    (2) Date of filing:

    (3) Docket number, case number, or opinion number:

    (4) Result:

    (5) Date of result:

    (6) Issues raised:

(b) If you answered "No," explain why you did not file a third appeal:

Mr. Bates was in BOP transit when the 11th Circuit rendered its opinion, by time

he arrived at his designated prison, time had lapsed for a SCOTUS filing.

10.  **Motion under 28 U.S.C. § 2255**

In this petition, are you challenging the validity of your conviction or sentence as imposed?

☒ Yes  ☐ No

If "Yes," answer the following:

(a)  Have you already filed a motion under 28 U.S.C. § 2255 that challenged this conviction or sentence?

    ☒ Yes  ☐ No

BATES, CAMERON  00407104

AO 242 (Rev. 09/17)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

Page 4

If "Yes," provide:

(1) Name of court: US District Court for the Southern Dist. of Florida.

(2) Case number: 2:17-CV-14365-KMM

(3) Date of filing: Late 2016

(4) Result: Relief denied

(5) Date of result: Feb. 2020

(6) Issues raised: 1)Ineffective Assistance of Counsel; 2)Double Jeopardy; 3) Multiple violations of Due Procedd; 4) Newly discovered evidence; 5) Brady/Jenks violations;  6) Prosecutorial Misconduct

(b)  Have you ever filed a motion in a United States Court of Appeals under 28 U.S.C. § 2244(b)(3)(A), seeking permission to file a second or successive Section 2255 motion to challenge this conviction or sentence?

☐ Yes            ☒ No

If "Yes," provide:

(1) Name of court:

(2) Case number:

(3) Date of filing:

(4) Result:

(5) Date of result:

(6) Issues raised:

(c)  Explain why the remedy under 28 U.S.C. § 2255 is inadequate or ineffective to challenge your conviction or sentence:   1) about 75% of Mr. Bates' original complaint (DE-1) had to be "culled" because of strict adherence to page limits by the Court (dening him any review on most issues); 2) 4 out of 5 of the main grounds were dismissed summarily because Bates was procedurally prohibited from raising them in a s.2255 because they were not first raised in direct appeal--despite the fact some of the issues the attorney failed to raise, but it was not considered IAC, and many of the issued barred for not first being raised on direct appeal were unknown to Bates until AFTER the direct appeal.

11.  **Appeals of immigration proceedings**

Does this case concern immigration proceedings?

☐ Yes            ☒ No

If "Yes," provide:

(a)  Date you were taken into immigration custody:

(b)  Date of the removal or reinstatement order:

(c)  Did you file an appeal with the Board of Immigration Appeals?

☐ Yes            ☐ No

BATES, CAMERON 00407104

AO 242 (Rev. 09/17)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

*PAGE 5*

If "Yes," provide:

(1) Date of filing: _____

(2) Case number: _____

(3) Result: _____

(4) Date of result: _____

(5) Issues raised: _____

(d)  Did you appeal the decision to the United States Court of Appeals?

☐ Yes          ☐ No

If "Yes," provide:

(1) Name of court: _____

(2) Date of filing: _____

(3) Case number: _____

(4) Result: _____

(5) Date of result: _____

(6) Issues raised: _____

12.  **Other appeals**

Other than the appeals you listed above, have you filed any other petition, application, or motion about the issues raised in this petition?

☒ Yes          ☐ No

If "Yes," provide:

(a) Kind of petition, motion, or application:  Application for a COA for s.2255

(b) Name of the authority, agency, or court:  US Dist. Court for the Southern Dist of Florida

(c) Date of filing:  March 2020

(d) Docket number, case number, or opinion number:  2:17-CV-14365-KMM

(e) Result:  COA denied.  (Also denied by the 11th Cir. and Cert. Denied by SCOTUS)

(f) Date of result:  March 2020

(g) Issues raised:  That reasonable jurists would find the Court's decision wrong or debatable. (Included was an affidavit by a 40+ year trial attorney stating 25 pages of how the Court's actions were wrong or debatable, and a second one to the 11th Circuit.  Both were ignored.)

BATES, CAMERON 00407104

AO 242 (Rev. 09/17) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

*Page 6*

### Grounds for Your Challenge in This Petition

13. State every ground (reason) that supports your claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:** Several of the Special Conditions of Supervised release, imposed as part of the sentence, are unconstitutionally vague, overbroad, and/or are impossible to abide by or not violate, and violate 18 USC 3583, et. seq.

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

In summary, some of the special conditions are so worded that they're rendered impossible to comply with in today's society. They're so broad, vague, and extreme that, as written, Mr. Bates will have at least five (5) violations upon leaving the prison's gate, and will amass 50-100 violations per day ding normal actions like using an ATM, making a phone call, or watching TV. (See attached memo of law.)

(b) Did you present Ground One in all appeals that were available to you?

☐ Yes      ☒ No (Mr. Bates sought to have them raised in his direct appeal but his attorney failed to do so, and they were cut from his s.2255 by court order.)

**GROUND TWO:** Mr. Bates' conviction, and by extension, his sentence, violates Mr. Bates' constitutional protections against Double Jeopardy through successive prosecutions due to prosecutorial misconduct exhausting the defense's resources and giving the Government a "dry run" at trial. (See attached memorandum of law)

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

(See attached memorandum of law and facts for complete details.) In summary, Mr. Bates expended all his financial resources fighting first the State case on these charges, then a first trial and appeal federally (costing over $100,000 in defense costs/fees), which was reversed due to prosecutorial misconduct. In Bates-II, Bates was in jail, unable to assist in his own defense, and left to the PD. office

(b) Did you present Ground Two in all appeals that were available to you?

☐ Yes      ☒ No (While raised on 2255, it was not known to be available to Mr. Bates until AFTER the direct appeal, then denied procedurally on the 2255 for not raising it on direct appeal.

**GROUND THREE:** Mr. Bates' sentence of the statutory maximum of 20 years was based, in whole or part, upon inaccurate and/or false information (deemed false by by the 11th Circuit Court of Appeals).

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

(See attached memorandum of law/facts for more detailed information) Throughout Mr. Bates' trial, over objection, the Prosecution refered to Mr. Bates as "a big fish and "worst of the worst" offender, despite his offense being a minimal one compared to most other offenders. The 11th Circuit considered this a continuation of the smean committed by the prosecution in Bates-I. (See attached memo of law)

(b) Did you present Ground Three in all appeals that were available to you?

☒ Yes      ☐ No

BATES, CAMERON 00407104

AO 242 (Rev. 09/17)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

*Page 7*

**GROUND FOUR:** _____

_____

_____

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

_____

_____

_____

_____

_____

(b) Did you present Ground Four in all appeals that were available to you?

☐ Yes          ☐ No

14.  If there are any grounds that you did not present in all appeals that were available to you, explain why you did not:

_____

_____

_____

**Request for Relief**

15.  State exactly what you want the court to do: _____

Mr. Bates is seeking that his sentence of incarceration and/or special conditions of supervised release be struck and reconsidered based on the reasons detailed herein. He also seeks a finding that Double Jeopardy attached (or should have attached) to his case after Bates-I was vacated for, inter alia, prosecutorial misconduct, and that his second federal trial -- and by extension, his sentence -- was unconstitutional.

BATES, CAMERON 00407104

AO 242 (Rev. 09/17)  Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

Page 8

## Declaration Under Penalty Of Perjury

If you are incarcerated, on what date did you place this petition in the prison mail system:

3/18/22

I declare under penalty of perjury that I am the petitioner, I have read this petition or had it read to me, and the information in this petition is true and correct.  I understand that a false statement of a material fact may serve as the basis for prosecution for perjury.

Date:  3/18/22

_____
*Signature of Petitioner*

_____
*Signature of Attorney or other authorized person, if any*

BATES, CAMERON 00407104

## Table of Contents.

General Assertions                                        Page  10
Ground One
    Legal Standards                                       14
    Argument                                              14
        Computer Possession Restriction               15
        Financial Disclosure Requirement              21
        Restriction on Sexually Explicit Material      23
        No Contact With Minors                         26
    The Special Conditions Run Afoul of the Law           28
Ground Two
    Legal Standards                                       30
    Argument                                              30
Ground Three
    Legal Standards                                       37
    Argument                                              37

General Assertions.
(Pertinent Portions)


Mr. Bates was arrested in 2012 by members of the St. Lucie County Sheriff's Office for Possession of Child Pornography. The matter was being prosecuted by the State of Florida. After the case was filed and initial discovery exchanged, the Defense provided the State with alibis for 2/3 of the alleged illegal activity times and dates, including most notably the fact when the largest single download which happened at Mr. Bates' home in Port St. Lucie, Florida (on the east coast), Mr. Bates was indisputibly in Tampa -- on Florida's west coast some 300 miles away -- taking the Florida Bar Exam. Based upon these and the other alibis which the State Attorney's Office verified, charges were dismissed against Mr. Bates.

About 10 days later, the Sheriff's Office had Mr. Bates charged with a Federal complaint for Child Pornography, and this time leaving out as many of the incidents for which Mr. Bates had alibis. (See 2:12-CR-14054-KMM, So. Dist of Fla.)

This first federal trial of Mr. Bates (Bates-I) was replete with improper actions by the Court and misconduct by the prosecution that was unchecked by the judge. Although this trial resulted in a conviction, it was reversed in a scathing opinion by the 11th Circuit (US v. Bates, 890 Fed.Appx 882 (11th Cir. 2014) where even the dissent considered the prosecution's actions improper and "wrong", and the Majority found the actions by the prosecution "shocking" and "intended to bias the jury".

Although a second trial was held, Mr. Bates was no longer in a position to defend himself as he did in Bates-I. In Bates-I, Mr. Bates had a private attorney working almost exclusively on his case. Mr. Bates, who had already passed the Florida Bar and was able to use his legal knowledge to greatly assist in his defense, was locked away at a county jail with no legitimate law library access, and therefore unable to assist in his own defense. Mr. Bates' funds were depleted after spending them all on his original trial and appellate counsel, forcing him to rely on a overworked public defender. And in Bates-I he had the funds to employ top-of-the-line experts like Salvatore Rostrelli, the former head of the Martin County Sheriff's Office Detective Bureau and head of the ICAC (Internet Crimes Against Children) Task Force. By Bates-II, neither he nor the public defender could afford these experts.

Additionally, unbeknownst to Mr. Bates at the time, the Sheriff's Office
had engaged in ex-parte communications with Mr. Bates' (then) wife telling
her about his unrelated extramarital affairs they discovered in the course
of their investigation. This caused his former wife to testify poorly in
trial, and shortly thereafter, she divorced him. (It wasn't until years later
she told him about the ex-parte communications which were raised in Mr. Bates'
s.2255 appeal, but the Court refused to act upon them or grant an evidentary
hearing on the matter.)

Despite the fact that the Government admitted that they "accidentally"
tampered with the computer, and that the total number of illicit images on
it changed from about a dozen (in the State case) to about 40 (when Sheriff's
Sergeant Parrow was the "expert" for the Government) and finally to 110 (when
Homeland Security Agent Ray was the replacement expert for the Government), it
was undisputed, originally, that the total number of images which the Government
finally claimed was exceedingly minimal when compared to most of these cases
(wherein offenders have thousands of images or so many that they're quantified
by the storage amount they use, like "10 terabytes of images"). Also, there
was absolutely no allegation that Mr. Bates ever tried to contact anyone
in this case -- adult or child. Most notably, Agent Ray reluctantly admitted
in Bates-II that there was no evidence whatsoever that even placed Mr. Bates
at the computer or home at the time of the illegal activity, or that he dis-
tributed anything to anyone. (Note that in the Federal jurisdiction, the
charge of Receiving Child Pornography can be upheld by the possession of it,
using the logic that one must have received it to possess it. Also, despite
admissions from Agent Ray and Case Agent Valentine that there was no evidence
of Mr. Bates (or his computer) distributing any illicit file to anyone, des-
pite Valentine trying for over three years to obtain it from Bates' IP Address,
under Federal Law, Mr. Bates could be charged -- and was charged -- with
Distribution of Child Pornography because a defendant can receive this charge
simply for having Peer-to-Peer (P-2-P) software as the means to obtain it,
even if nothing was distributed through it.

Put simply, Mr. Bates was a de minimus offender who was charged because
of the files on a computer he owned, not for actually receiving it, distrib-
uting it, viewing it, or anything other than constructively possessing a

relatively small amount of illicit images.

However, despite this being the general factual basis by the Government for nearly four years, in the midst of the Bates-II trial, Detective Valentine on direct examination stated that Mr. Bates was a "big fish" and "worst of the worst" offender, which is why he spent three years looking for him.  The Defense objected stating that this was a gross mischaracterization of both Mr. Bates and the facts of the offense itself.  The Defense pointed out that the amount of illicit material discovered was so low as to be almost unheard of to prosecute such small amounts of data.  The objection was overruled, and over a standing objection, the Government and every one of thier witnesses parroted the same claim that Mr. Bates was a "big fish" and "worst of the worst".

Mr. Bates was again convicted.  And despite Mr. Bates' lack of any prior criminal conduct, being an otherwise outstanding citizen, and minimal nature of the offense compared to nearly all other cases like this one (and the fact that Mr. Bates went from 19 counts in Bates-I to 6 in Bates-II), the Court after stating they considered the 3553(a) factors, sentenced Mr. Bates again to the statutory maximum of 20 years.

Mr. Bates appealed this conviction, but the public defender handling it failed to include issues Mr. Bates told him to include.  Instead, he only raised two issues:  Hearsay nature of the ICAC data and the characterization of Mr. Bates as a "big fish" and "worst of the worst".  Incidently, the Government, despite never calling Mr. Bates this in any prior document or pleading, called Mr. Bates, or used the phrase, "big fish" and "worst of the worst" in nearly every paragraph of thier response to Mr. Bates' appeal.  In fact, they used that phrase more than the phrase "Child Pornography"!

The Court in the appeal affirmed the conviction, but solidly held that the hearsay was improper and that the characterization of Mr. Bates as a "big fish" and "worst of the worst" was not just false, but a continuation of the smear they used against Mr. Bates in the first trial.  The 11th Circuit noted that Mr. Bates was, in fact, a de minimus offender compared to most people convided of these crimes.  Sadly, the public defender failed to raise the sentence in the appeal.  (See US v. Bates, 665 Fed.Appx 819 (11th Cir. 2016).)

After the appeal, Mr. Bates received a letter from his Public Defender stating that he should do a pro se 2255 appeal and cite Double Jeopardy as grounds for it.  Mr. Bates did file such an appeal, citing inter alia,

Double Jeopardy. (This matter will be discussed in detail later in this pleading.) Unfortunately, the District Court denied relief without any real review of much of the issues (including Double Jeopardy) claiming that Mr. Bates was procedurally prohibited from raising them in a 2255 because he failed to raise them in his direct appeal. (Ironically, Mr. Bates raised an Innefective Assistance of Counsel claim, which was denied saying it wasn't ineffective to fail to raise the claim in direct appeal.) (See s2255 case number 2:17-14365-KMM, So. Dist. of Fla.)

Finally, some of the issues Mr. Bates tried to raise in his s.2255 are now being presented here as a s.2241 claim that the sentence violated law and/or is unconstitutional.

I.  GROUND ONE:  Several of the Special Conditions of
Supervised Release are Unconstitutionally Vague, Overbroad,
Overly Burdensome, and/or are Impossible to Comply With,
and Violate 18 USC 3583, et.seq..

## Legal Standards.

A court has the discretion to include in its sentence special conditions
of supervised release pursuant to 18 USC 3583(d).  However, the law states
that these conditions cannot create a greater depravation of liberty than
is reasonable to achieve the statute's goals.  These goals are:

1.  Affording adequate deterrence to criminal conduct;

2.  To protect the public from crimes of the defendant, and;

3.  The need to provide the defendant with needed training, medical care,
    or other correctional needs.

Moreover, the courts will hold laws, orders, etc., "unconstitutionally
vague" if such issues fail to give reasonable notice of what conduct is
actually prohibited as determined by a reasonable person, or it permits
"arbitrary enforcement", thereby allowing Government actors to decide, without
any consistent standards, what conduct is or is not permitted under the same
rule, law, or guideline.  US v. Matchett, 837 F.3d 1118, 1122 (11th Cir. 2016)

Furthermore, the Government cannot suppress protected speech to suppress
unprotected speech.  Ashcroff v. the Free Speech Coalition, 535 US 234, 255 (2002)

## Argument.

Mr. Bates' special conditions of supervised release contain several
conditions that Mr. Bates asserts are unconstitutionally and/or statutorialy
overbroad, vague, and/or greatly exceed the necessary or reasonable deprivation
of Mr. Bates liberty and rights in violation of, inter alia, 18 USC 3583.  They
are also so fundamentally impossible to NOT violate in today's society, as
to be impossible for anyone to comply with.  These conditions are as follows:

-- COMPUTER POSSESSION RESTRICTION - The defendant shall not possess or
use ANY computer, except that the defendant may, with prior approval of the
Court, use a computer in connection with authorized employment.

   -- <u>FINANCIAL DISCLOSURE REQUIREMENT</u> - The defendant shall provide complete access to financial information, including all business and personal finances, to the U.S. Probation Officer.

   -- <u>RESTRICTION FROM POSSESSION OF SEXUAL MATERIALS</u> - (In pertinent part) The defendant shall not buy, sell exchange, possess, trade, or produce depictions of minors or adults engaged in sexually explicit conduct.

   -- <u>NO CONTACT WITH MINORS</u> -  The defendant shall have no contact with minors under the age or 18.

(Judgement and Commitment,  DE-395, p.4)(Emphasis added.)


   Each of these restrictions, even if they seem simple or non-burdensome on thier face, are in fact quite improper and volitive of law and the constitution.

## Computer Possession Restriction.

   In it's computer possession restriction, the Court denied Mr. Bates access to computers use so great in breadth and scope as to be almost singularly unique in Federal (or state) court opinions.  In most sex-related cases, the courts permit defendants somewhat liberal licit use of computers, or defer to the defendant's probation office as to the degree of restrictions to impose based on the individual needs of the defendant.  And even that deferral has been deemed too restrictive in some circuits.  (See, inter alia, <u>US v. Blair</u>, 933 F.3d 1271 (10th Cir. 2019).)  Even the long held, draconian opinion in <u>US v. Zinn</u>, 321 F.3d 1084 (11th Cir. 2003), which is one of the most restrictive of all the circuits concerning sex offender access to computers and internet, still allowed a multiple-offending sexual <u>predator</u> (as opposed to an "offender") some access to computers and the internet. (The <u>Zinn</u> case will be discussed later at length.) Yet, Mr. Bates -- who even the 11th Circuit deemed a minimal offender -- was specifcally denied <u>ALL</u> use of <u>ANY</u> computers whatsoever.

   To grasp the scope of this condition imposed by the Court, and thereby see the magnatude of its unconstitutional and illegal overreach, one must see how the law defines the terms "COMPUTER" and "ANY" as used in this condition.

   Tackling the simpler one first, the term "ANY" is legally recognized in the 11th Circuit as to mean, and be interchangable with, the term "ALL".  "ANY"

means "ALL". (See Merritt v. Dillard Paper Co, 120 F.3d 1181, 1186 (11th
Cir. 1997); US v. Gonzalez, 150 US 1, 5 (1997).) Therefore, as written, this
condition of supervised release prohibits Mr. Bates from use, possession, etc.
of ANY or ALL computers of any kind, for any reason, without exception.

The second term, "COMPUTER" is somewhat more complex a question. Without
a definition provided by the Court, or a legal standardized definition at law, a
definition, legally, defaults to the "common useage rule" wherein the common
definition from secondary sources are used. (Dictionaries and encyclopedias.)
As Black's Law Dictionary has no computer definition, Mr. Bates turns to
more common reference works:

"A programmable electronic device that can store, retrieve, and process
data." Mirriam Webester Dictionary, 2016, p.148.

"A high-speed electronic machine that performs mathmatical or logical
calculating and processes, retrieves, and stores programmed information.
Webester's II New Riverside Dictionary, 1988, p.89.

"An electronic machine which, by means of stored instructions and in-
formation, performs rapid, often complex calculations, or compiles, correlates
and selects data. Webester's New World Dictionary, 4th Edition, P.300.

However, a more detailed and enlightening  definition comes from The
World Book Encyclopedia (Vol. 4, pp.908-923, David Gelernter and Keith Ferrell,
1994) that explains not only that computers are, as the dictionaries define,
machines capable of rapid storage, retrieval, processing, and calculation
of data, but further sub-divide computers into three distinct groups: Servers/
mainframes, work stations, and embedded computers. The first two are self-
explanitory. But the third group of computers -- embedded ones -- are the
real issue here. According to Gelernter and Farrell, embedded computers are
such computer/computerized components of other devices which, in turn, are
dependent on these embedded computers to function. These commonplace embedded
computers include computer "chips" (PROM, RAM, ROM, EPROM), intergrated cir-
cuits, etc.. And nearly every electronic device relies upon them. And so,
if Mr. Bates uses or possesses any such device that contains, operates upon,
or relies upon such embedded computers, he is by extension, using a computer
in violation of this condition of supervised release. Imagine: If Mr. Bates

watches a TV, listens to a radio, makes a phone call, wears a battery/solar powered watch, drives a post-1984 car, makes a phone call (even from a non-cellular phone), activates a crosswalk by pushing the button to cross the street, uses an ATM (or even a smart-chipped ATM card), uses a vending machine, or even tries to use a law library (which are all now using LEXIS or Westlaw terminals instead of book-style reporters), then he'll be in violation of this condition.

Simply put, nearly every device that uses electric today is, by definition, a computer. In fact, the second Mr. Bates steps out of prison, he will be in possession of a watch, a radio, an MP-3 player, a pocket calculator, an alarm clock (all of which were purchased by him in prison at the commissary) as well as an ATM card which will contain a smart-chip. All of which are computers by definition, And all of which will violate Mr. Bates' condition of supervised release. Mr. Bates estimates that between the time he leaves prison in the morning and first reports to his probation officer in the evening, he will amass between 30 and 50 computer violations alone. And short of living on a deserted island like Tom Hanks on Cast Away, there is no way to avoid it.

Computers are ubiquitous in today's society. For Mr. Bates to access the Florida Job service to get a job, he must apply online. He has no choice as the FJS only takes on-line applications. And for those who don't have computer access, the FJS provides free transport to a local college computer lab to access them. (And due to Florida's SORNA law, he can't even to that.) Many large employers only take online applications. And nearly every job requires a phone for prospective and actual employees. As Mr. Bates will be effectively homeless upon release, the only phone he could rely upon would be a cell phone. But, alas, a phone -- even one that's not a smart phone -- is still a computer. Televisions are all digital, and therefore, televisions convert the digital mathmatical code into picture and sound. Its a computer, so no TV for Mr. Bates. Just watching one is verbotton as it constitutes "USE" of a computer within the definition of the term. If Mr. Bates goes to the store, he'll have to only use cash. This means he cannot use the Food stamp/SNAP program because (1) the application process is online, and; (2) the program issues smart-chipped debt cards (a violation to possess in itself),

and using it requires swiping it into another computer. And getting
cash? An ATM is out, and many banks are begining to require some
computer access to identify yourself. (biometrics, card swipes, etc.)

One can see how impossible life will be for Mr. Bates if this condition
was enforced to the letter. Now, the Government may, in it's reply, state
that Mr. Bates is being rediculous, and that his analysis is a textbook case
of Reductio ad Absurdum. But is it? The decision to enforce such conditions
doesn't fall upon one, single individual to decide what will and won't
be enforced. For example, Probation Office "Bob" may be Mr. Bates' primary
supervisor and he may say, "Go ahead and get a cell phone, just don't enable
the internet on it." (as many do). Then, Mr. Bates gets a new P.O., or a
different one fills in while Bob's on vacation, or Mr. Bates gets stopped
by some random officer. This new officer says, "that phone's also a computer"
and arrests Mr. Bates for violation of supervised release. Granted, Mr. Bates
may not be convicted based on Bob's earlier permission. But he'll still be
arrested, jailed, and face all the problem that go along with that like job
loss, costs, and other issues.

<u>The law is what the law is.</u> It is not the job for officers to try
to enforce what they think the <u>intent</u> of the judge was, but instead to enforce
<u>exactly what the law says.</u> And as stated earlier, the law says a rule, law,
ect., is void for vagueness if it allows for arbitrary enforcement, or if
two or more reasonable people can differ on what is or isn't permissable.
Is my electronic toaster a "computer"? How about a DVD player? What about
my diabeties glucose monitor? (Will I go to jail for checking my blood sugar?)

Clearly, the <u>Matchett</u>'s Court's ruling is on all fours here. This
condition of banning "ANY" (meaning "ALL") computers is too vague to stand.

Additionally, denial of all computer use prohibits, by extension, all
internet access. Numerous courts have held that in today's society, access
to the internet is not a luxury or convenience, but it is absolutely necessary
and a protected first amendment right. (See, inter alia, <u>Packingham v. North
Carolina</u>, 198 L.Ed 273 (2017).) Granted, a right -- even a fundamental one --
may be limited by the Court as part of supervised release. But the statute
was clear on such limitations. And in <u>Packingham</u> and <u>Zinn</u>, the defendants
had at least <u>some</u> access to computers and the internet. <u>Mr. Bates has none.</u>

And <u>Zinn</u> and <u>Packingham</u> were both repeat offending <u>predators</u>, not simple

and first-time offenders like Mr. Bates.

Mr. Bates, using his limited prison law library, searched every circuit looking for any condition that matched Mr. Bates' in scope and severity. (One in which any/all computer use/possession/access was prohibited.) Mr. Bates found only one: US v. West, 333 Fed.Appx 494 (11th Cir. 2009) in which the defendant, like Mr. Bates, appealed this broad computer restriction. That Court held the condition was a scrivner's error and ordered it corrected.

As mentioned previously, the Government and Courts in the 11th Circuit have fixated solidly upon the Zinn case since 2002. Essentially, Zinn held that protecting children outweighed the need for Mr. Zinn to access the internet. Of course, in 2002, nearly every circuit had the same opinion because the internet -- and computers in general -- were still in thier infancy. But in the last 20+ years since Zinn was decided, the techonology of the day has changed to make computers a part of everyday life. They are ubiquitous with every electronic component and device we use. Internet reliance -- especially in a Covid and post-Covid world -- is now the norm. More merch- endice is purchased by consumers online then in stores. Doctors use telemed for minor issues. Classes are online, as are business meetings. Much of television and movies are presented through streaming services, not theaters or over-the-air means. For this reason, pretty much every other circuit permits sexual offenders, like Mr. Bates, access to the internet with cond- itions such as monitoring, inspections, or limitation to "licit" activities.

For reasons unknown, the 11th Circuit has steadfastly refused to move from 2002 in this regard. It holds the other circuits' more liberal allow- ances as "wrong". It uniquely considers that the Packingham finding that internet access was a necessary tool for people in today's society "especially" for people coming from prison, to somehow be interpreted as only after that person has completed 5-20+ years of supervised release will that need manifest itself. And while the 11th Circuit's finding is clearly not keeping with the times, its still the law of this land.

But to demonstrate how much life has changed -- computer-wise -- since Zinn, consider these facts:

-- In 2002, when Zinn was ruled upon, less than 50% of homes had inter- net, and most used dial-up modems. Over 750,000 payphones were in use nation- wide. In 2002, the average computer for personal use had just 128 or 256

megabytes of RAM and 20 Gigabytes or less of drive storage. Only 65% of Americans used a home or business computer in any way, and only 53% of Americans accessed the internet in any way or amount. Facebook did not yet exist. (Source: <u>World Almanac and Book of Facts</u>, Lori Wiesenfield, ed, 2003)(internal citations omitted.)

By 2021, however, payphones were essentially all but gone except in airports, and paper phone directories were no longer published by any phone company in lieu of online resources. Smartphones (which did not come into existance until 2006 with the first I-Phone) were owned by 91% of americans by 2021. In that year, 75% of homes had a laptop/PC/tablet, 51% had streaming media devices (dedicated), and 23% had smart watches. By 2020, an estimated 90% of Americans (246,809,221 people) regularly -- meaning at least three times a week -- accessed the internet. In the U.S. the average American spent 22.5 hours a week online, compared to just 11 back in 2002. And while the first I-Phone was sold in 2006, by 2016 over One-billion had been sold.(Id, 2021 edition.)

This just scratches the surface of of the technology that's changed from barely or non-existant in 2002 to being a necessity because the non-computerized version of what was available no longer exists. (Like law libraries with hard-bound reporters or phone booths.)

<u>Zinn</u> is bad law, plain and simple. <u>Zinn</u> is the 11th Circuit's attempt to keep the horse-and-buggy relevent on an interstate highway. And while Mr. Bates realizes that a District Court cannot overrule <u>Zinn</u>, ñor can a 3-justice panel of the Appeals Court, a Trial Court can, and should, make a stand and while abiding by <u>Zinn</u> opine that is does so in protest. State the <u>Zinn</u> ruling's day has past and it's time for the 11th Circuit to enter the modern age. With such a ruling, Mr. Bates can legitimately seek an en banc review of <u>Zinn</u> under the prior panel rule.

In conclusion, the computer restriction of Mr. Bates' condition of supervised release is improper, illegal, and unconstitutionally vague and overbroad. It's impossible in today's society to comply with and must be struck down and replaced with a more realistice restriction.

Page 21

Financial Disclosure Requirement.

    One of the special conditions of supervised release is a "financial disclosure requirement" which requires Mr. Bates to disclose ALL his financial information to the probation officer.  Specifically, it states: "[Mr. Bates shall] provide complete access to financial information, including disclosure of business and personal finances, to the U.S. Probation Officer." (DE-395, p.4.)

    Arguably, the Government may have a legitimate interest in the finances of a defendant IF said defendant either had a financial obligation in the case which was still outstanding (eg: restitution, fines,etc.), or the defendant's offense had a financial element, such as purchasing or selling illicit materials.  **Neither is the case in this offense.**

    In Mr. Bates' case, he did not purchase, sell, or have any financial interest or element in the offense, nor did the Government allege any.  Moreover, Mr. Bates fully paid all of his $4,100.00 in financial obligations in this case.  (In fact, he overpaid his obligations and had to fight to get the government to refund the overpayment to him.)  Mr. Bates' financial obligations in this case are fully satisfied.

    The Fourth Amendment of the Constitution protects Americans from unwarranted searches and seizures, and to be "secure in their persons, houses, papers, and effects, against **unreasonable** searches and seizures". (U.S. Const., Amend. 4.)  And while being on supervised release allows the court to curtail some rights under the Fourth Amendment, the law is still very clear:  Such conditions must be tailored to meet a legitimate goal of the Government, and must not entail a greater deprivation of liberty necessary to achieve that goal.  (18 USC 3583(d))

    It is undisputed that Mr. Bates has satisfied all financial obligations in this case. (See, inter alia, DE-243, et. seq.) Moreover, the record is clear that there was no financial element in this case.  Therefore, the Government has no legitimate or reasonable interest in having unfettered access to Mr. Bates' financial information, as there is no goal served by allowing it.

    Moreover, allowing such unlimited access to Mr. Bates' financials allows the Government to go on "fishing expeditions" to seek evidence on unrelated matters, circumventing the Fourth Amendment in doing so.

It's said that the Constitution is not abandoned at the steps of the schoolhouse. Nor so is it abandoned upon entry to prison or upon leaving it or at the steps of the probation officer's office. Allowing this condition to stand will allow the US Government (or any other local, state, or federal agency acting through or in concert with the Probation Ofice) to circumvent the Fourth Amendment with impunity. Even the Government's right to search Mr. Bates' home and person -- which is much more legitimate and reasonable given the nature of the offense -- is limited within the conditions of supervised release in Mr. Bates' case in that a probation officer must have "reasonable suspicion concerning unlawful conduct or a violation of [] supervised release." (DE-395, p.4, "Adam Walsh Search Conditions".)

Accordingly, as allowing unlimited and unrestricted access to Mr. Bates' financial and business records 1) Has no relevance to the case, and; 2) Circumvents Mr. Bates' Fourth Amendment rights, and; 3) Furthers no legitimate goal of the Government as there is no financial element in this case, the condition allowing such unfettered access must be struck.

Restriction on Sexually Explicit Material.

Mr. Bates was sentenced to a supervised release condition titled, "Restriction from Possession of Sexual Materials." The condition futher prohibits Mr. Bates from possession, purchase, sale, transfer/exchange or viewing (or communicating with others to do so) any "minors or adults engaged in sexually explicit conduct". (DE-395, p.4)

Mr. Bates has no interest in obtaining or viewing commerically produced, explicit sexual materials such as X-rated videos or magazines such as Penthouse or Playboy, therefore Mr. Bates has no objections to restrictions of that sort of overtly pornographic materials. His concern is the definition of "sexually explicit conduct" and its impact on Mr. Bates' access to Constitutionally protected materials. Moreover, he is concerned that this condition is unreasonable because the Court has not demonstrated a connection between such materials and the legitimate goals of the Government under 18 USC 3583.

First, the Court in Mr. Bates' case failed to define "sexually explicit conduct". However, the courts in the 11th Circuit often use 18 USC 2256(2)(A) as a definition. That statute defines "sexually explicit" as, inter alia, visual depictions of "actual or simulated" sexual activity or intercourse, or the depictions of the breasts or genitals. (Emphaiss added.) This raises several issues:

First, s.2256 prohibits "simulated" sexual activity or intercourse. This alone raises two distinct issues that chill or violate Mr. Bates' legitimate and protected First Amendment rights. The first is that such a definition is overbroad. While it is true that such a condition will prohibit Mr. Bates from accessing adults or children engaged in hard-core pornography (even though child pornography is already illegal, thereby making this part of the condition redundent and unnecessary), it will also make watching TV and movie selections illegal as well. For example, soap operas regularly (usually on every episode) show people simulating sexual intercourse (albeit under bedsheets). Comedy and farces regularly show people engaged in sex or displaying nudity, not for purient interests, but instead for humor. (Such as in classic movies like Airplane!, Animal House, and Monty Python and the Holy Grail, just to name a few. Dramatic and artistic works would also be swept up in such a prohibition. Classic works in museums worldwide, like the works of Rubin, Rodan, and much of the classic artworks of the Renasance

would be swept up just as hardcore pornography would.

And Mr. Bates is not just probibited from viewing or possesing these items, but is prohibited from even going to locations where these items are available, even if Mr. Bates had no intent of buying to viewing them or even had knowledge of the prohibited items being present. This would make public libraries, convenience stores, big-box retailers such as Wal-Mart (which has videos containing nudity and simulated sexual activity in R-rated form), museums and alike off-limits to Mr. Bates.

Granted, one would expect a law enforcement or probation officer to use common sense and not arrest or violate Mr. Bates for watching or possessing the sci-fi classic The Fifth Element or watching re-runs of The Big Bang Theory on TV. But the fact is an officer (granted, a probably overzealous one) COULD legally arrest or violate Mr. Bates for such an "offense" as watching a soap opera or looking a Rodan's classic sculpture "The Thinker". Granted, a court would (hopefully) dismiss a violation based on such a incident. But the mere fact that the probation officer or law enforcement officer CAN legally make such an arrest or violation renders the condition, as worded, unconstitutional.

A second issue is that the law requires a condition to be reasonably related to a legitimate goal of the government. However, the Court failed to show any factual, statistical, or scientific data to show how denying access to sexually explicit material will further the statutory goals of the governemnt. In the instant case, the only conduct Mr. Bates is actually accused of is having a de minimus amount of child pornography on his computer. The government, through its key witnesses, admitted there was no evidence that Mr. Bates, himself, actually viewed the illicit materials, or was even behind the computer at the time of the downloads. (See pages 11, 12, Supra this pleading.) Therefore, how will preventing Mr. Bates from watching Benny Hill reruns or having a Rubin print on display achieve any statutory goal of the Government?

A recent case in the Tenth Circuit addressed an identical condition of supervised release. It vacated such a lower court decision probibiting the viewing of sexually explicit materials concluding that the coart failed to justify such a condition, or even provide generalized reasons for such a condition. Moreover, the Tenth Circuit held that even if there were a legitimate, rehabilitative reason to have such a condition, the condition

must be balanced against First Amendment concerns.  (U.S. v. Englehard, No. 21-8007 (10th Cir. 2022).)

Therefore, this condition must be struck and/or modified insomuch as protected materials are not swept up with unprotected materials. It's improper, as this conditon does, to ban protected speech to prevent unprotected speech.  Ashcroff v. Free Speech Coalition, 535 US 234, 255 (2002).

Finally, the definition used to determine if its "sexually explicit" comes from a statute not seeking to give a general definition of sexual explicitness, **but rather it is a statute defining what conduct by a CHILD is sexually explicit.**  There is a significant difference between what conduct is sexually explicit for a child and for an adult.  The same activity by each will be percieved differently when it is conducted by a child than when by an adult.  For example, a woman in a teddy kissing a man (or woman, given today's norms) shown in a TV show or movie would not necessarily be considered "sexually explicit".  But change one of the people kissing to a child -- especially a young child -- and the perception clearly changes.  While it's commonplace to see a TV show or movie with two adults under bedsheets clearly engaging in "simulated sexual acitviry", and not generally considered to be "sexually explicit", having one or both parties being a child while in flagrante delicto  -- even under bedsheets -- and the scene is of a completely different interpretation and undisputably "sexually explicit" (and probably criminal).

18 USC 2246 is a definition meant for the conduct of children or minors, and not necessarily that of adults.  Therefore, it's an improper definition to use, and the use of it instead of a more precise definition has the effect of making the prohibited activity overbroad and denies Mr. Bates access to constitutionally procected materials.

In the case of U.S. v. Gnikre. 775 F.3d 1155 (9th Cir. 2015), the Ninth Circuit affirmed the lower court's narrowing of the same condition Mr. Bates has, holding that such a broad definition would sweep up protected speech along with unprotected speech.

Therefore, Mr. Bates would like to have the Court make a better condition (or strike the condition altogether) which properly meets the legitimate and verifiable goals of the Government while not denying access to protected speech.

<u>No Contact With Minors.</u>

Mr. Bates, currently, has no minor family members, and therefore seeks no excemptions for access to any SPECIFIC minors at this time.

However, the "no contact with minors" restriction specifies that Mr. Bates can have no contact which is "personal, [or by] mail, telephone, or computer [] with minors or children under the age of 18." (DE-395,p.4)

The issue Mr. Bates presents is the question of what is defined as "personal contact". The Court gave no specific guidance as to what it meant, therefore, as in the computer definition, we must refer to secondary sources. The pertinent definition in most dictionaries is "of, relating to, or affecting a person", "done in person", and, "relating to the person and/or body". (Marriam-Webester Dictionary, id, p.537.)

Also, the term "no" as used in this condition's phrase "no...contact" is, like the term "any", an <u>absolute</u> in legal construction. It provides specifically for no exceptions. Therefore <u>ANY</u> contact "in person" or "personal contact" with ANYONE (remember, "any" means "all", legally in the Eleventh Circuit) under the age of 18, presumably even if Mr. Bates is unaware of their age, as the law doesn't generally recognize ignorance of age as a defense. So, in arguendo, if Mr. Bates goes to McDonalds and is served or waited upon by a person who is even merely a singly month (or day) shy of his or her 18th birthday, than Mr. Bates is in violation. If a child should knock on Mr. Bates' door offering girl scout cookies, even before he could say "no" or "go away", or even slam the door in the child's face, he'd be in violation. If Mr. Bates went to Wal Mart, and a child runs down the isle and into Mr. Bates, then he's made "personal contact" and Mr. Bates is subject to violation.

Moreover, this condition does not limit itself to "illicit contact" or "improper contact", or even "incidental contact". It fails to make allowances for incidental contacts (like the Wal Mart scenerio), de minimus contact (like the McDonalds scenerio), or unsolicited contact (like the child selling cookies).

The Court even failed to demonstrate how this restriction will meet any of the statutory goals related to the specifics of Mr. Bates offense. There is no claim or allegation by the Government that Mr. Bates even tried or intended to contact a child, much less any claim or charge of such a contact.

Additionally, there is no claim by the Government or medical diagnosis that Mr. Bates is (or was) a pedophile or has any purient interest in children. In fact, the evidence showed that sexually, Mr. Bates was interested in OLDER persons for such relationships, and -- as stated earlier -- even the Government's own witnesses conceeded that there is no evidence that Mr. Bates himself viewed or downloaded the materials, making the case, essentially, one of constructive possession of child pornography. Therefore, absent evidence to the contrary, there is no governmental interest in making such a broad, sweeping, condition. Furthermore, in order to comply with such a overbroad condition, Mr. Bates would have to move to a deserted island, a'la the movie Cast Away. And if such a condition were allowed to stand, Mr. Bates would constantly be left wondering what contact is permissable and what isn't -- the textbook example of unconstitutionally overbroad or vague.

Mr. Bates is not seeking permission to hang out a the local Chuck-e-Cheese or daycare facility. What he is claiming is the this condition is unnecessarily and unconstitutionally overbroad, and it violates 18 USC 3583(d). Accordingly, it must be struck and modified.

The Conditions Run Afoul of the Law.

18 USC 3553 cites the goals which the Courts must consider when imposing sentence, including special conditions of supervised release. The conditions cited herein as improper by Mr. Bates not only do not serve the s.3553 factors, but specifically work against s.3553(2)(D), which requires that conditions are designed to meet or further a goal of providing needed educational or vocational training, medical care, or "corrective treatment" in the "most efficient manner". But the fact is that cutting Mr. Bates off from society by denying him any computer access whatsoever and having him essentially run and hide from anyone he even suspects may be under 18, as well as avoiding any media that a probation officer could possibly -- however tennuously -- consider "sexually explicit", as well as any location that may possibly contain such materials, will not further the goals of s.3553, but instead prevent Mr. Bates from meeting them.

Additionally, "Special Conditions" of supervised release are supposed to be custom tailored to meet the specific needs of the defendant based upon the individual facts of the case and defendant. They aren't supposed to be generalized, "off-the-rack" or "boilerplate" conditions. If they were, they wouldn't be "special" conditions, they'd be standard conditions. In Mr. Bates' case, the conditions which the Court sentenced him to were actually boilerplate conditions, not special conditions specifically tailored to Mr. Bates' needs. This is clearly reflected on the record by the way the Judge not only did not detail how these so-called "special conditions" meet the statutory goals or defendant's needs, but also inasmuch as the Judge rattled them off, as if from a list of possible, pre-written, off-the-shelf conditions. Specifically, the Judge stated:

> "[Mr. Bates] shall comply with the standard conditions of supervised release, including the following special conditions:
>
> Data encryption restriction; computer possession restriction; employer computer possession disclosure; financial disclosure requirement; self-employment restriction; no contact with minors; Adam Walsh Act Search Condition and sex offender registration, as noted in part G of the pre-sentence report."

(Sentencing transcript, pp.17:18 - 18:5.)

As the record reflects, the Judge not only prattled off the special

conditions as if they were side dishes of a chinese menu, but he notably said
Mr. Bates will comply "with the standard conditions of supervised release
INCLUDING the following special conditions[.]" (Emphasis added.) Special and
Standard conditions of supervised release are two separate things, governed
by two separate sets of rules and guidelines under the law. Yet, clearly here,
the Judge simply lumped them all together as standard conditions, given based
on the charges, and not on the specifics of the defendant  and specifications
of the charges as the law requires.

For the above reasons, the special conditions must be struck and remanded
for proper consideration and creation in compliance with the law.

II.  GROUND TWO:  Mr. Bates' Conviction, and by Extension,
His Sentence, Violates Mr. Bates' Constitutional Protections Against
Double Jeopardy Through Successive Prosecutions Due to Prosecutorial
Misconduct Exhausting All of Mr. Bates' Resources and Giving the
Government a "Dry Run" at Successive Trials.

### Legal Standards.

The Constitution's Double Jeopardy clause protects a person against gov-
ernmental actions intended to provoke mistrials or reversals, which would
subject a accused to successive trials. Oregon v. Kennedy, 456 US 667 (1982);
U.S. v. Buck, 847 F.3d 267 (5th Cir. 2017); U.S. v. Dimitz, 424 US 600 (1976)
In both of Mr. Bates' trials, but especially Bates-I, the Government engaged
in tactics that were improper and specifically designed to bolster its weak
and circumstantial case.  U.S. v. Bates,  590 Fed. Appx 882 (11th Cir. 2014).
This allowed the Government to have a second go at Mr. Bates in Bates-II
wherein Mr. Bates (1) was now incarcerated, and despite his credentials as
a Juris Doctor and former legal assistant and paralegal which allowed him to
assist in his defense significantly in Bates-I (when he was out on bond), he
no longer had that ability in Bates-II where he was, essentially, a spectator
in his trial.  (2) Having exhausted all his resources in the Bates-I trail and
appeal, was broke and had to rely on the resources of an overworked and under-
funded public defender who did not have a fraction of the resources or witnesses
(lay and expert) available in Bates-I.  (3) And many of the Defense's witnesses
were no longer available to testify for Mr. Bates as some were deceased, non-
compus-mentus due to alzheimer's, or simply refused to assist due to the outcome
of Bates-I.

While Double Jeopardy does not generally prohibit re-trials after an
appeal is successful or after a mistrial, the superior courts ruled in the
cases detailed previously that such reprosecution is barred when the cause
of this reprosecution is based on governmental/prosecutorial misconduct or
intentional actions by the prosecution.

### Argument.

In 2013, the Government indicted and tried Mr. Bates for possession of
child pornography.  As the record reflects, the pretrial actions reflect a

huge volume of  improper actions by the Government and Court alleged by the
defense and, in many cases, later verified or supported by later discovery
or findings of the Court of Appeals, even if said allegations were, at first,
denied or dismissed by the Court.  The trial of Mr. Bates resulted in a con-
viction, but only after a firestorm of improper (often shockingly improper)
conduct by the Government.  The Court of Appeals reversed the conviction based
legally on the non-harmless error in jury selection. (See US v. Bates, Id.)
But the opinion's (and Court's) findings went much further.  It opined with
unminced words that the actions by the Government were intentional, willful,
and specifically were meant to inflame the jury's prejudices against Mr. Bates
for issues (sexual orientation) that were totally unrelated to the case.  The
Eleventh Circuit stated it was "shocked" by the actions of the Government
towards not just the Defendant, but to the witnesses as well.  Ironically,
the most persuasive agrument for the Government's egregious behavior comes not
from the majority, but from the dissent!  The dissenting justice, after detailing
his dissent, spent the last four paragraphs of his commentary lamenting the
behavior and misconduct of the Prosecution.  In part, it said:  "One is asking
why, if the evidence of guilt was as clear as I believe it was, the Government
asked improper, prejudicial questions.  A possible inference is that the Govern-
ment thought at least some jurors were biased [against homosexuals] and that
appealing to that bias would help bring about a conviction.  Why else would the
Government do it? ... It is with no entheuasm I dissent."

  Of course, the Dissent overlooked the fact that if the evidence was as
clear as he thought, the Government would not have to pander to bias.  (One
must remember that this case was first brought before the 19th Judicial Circuit
for the State of Florida, and after reviewing evidence and investigating the
Defense's Notice of Alibi, filed a No Prosse on the case finding it unwinnable.)
The Dissent's concern about the Government's actions brings focus to the pros-
ecution's true motives.  The government, as the Dissent suspected  and the State
of Florida knew, did not believe that the evidence in this case was clear or
convincing.  Although the government believed initially that nobody except
Mr. Bates used the computer, making him the main suspect by default, and
that being the sole prosecution theory of guilt, later discovered (but did not
disclose) that several other individuals had accessed the computer without Mr.
Bates' knowledge. (This fact was detailed at length in Mr. Bates' s.2255 appeal,

both as a Brady/Jenks violation and Ineffective Assistance of Counsel against
the Public defender, when -- after the Government and thier witnesses repeatedly
stated under oath before the Bates-I jury that Mr. Bates was the sole user of
the illegal laptop and his contentions others used it were "lies" -- the
Government disclosed transcripts to the Defense on the first day of Bates-II's trial
of a Grand Jury hearing held secretly (under the heading "US v. John DOE")
and prior to the Bates-I trial that a friend of Mr. Bates' son admitted that
he and five (5) other named individuals used the computer.  Dispite this
obvious violation of evidentary rules and the incredibly exculpatory nature
of this revelation, Mr. Bates' public defender failed to act upon it.)  It was
also discovered, well after the fact, that during the preliminarys of the Bates-I
case, when the Defense was alleging evidence tampering due to breaches of the
chain-of-custody of the laptop computer in question, and when the Prosecution
was calling such allegations of eveidence tampering with the computer "conspir-
acy theories without merit" (See the numerous pre-trial motion on this matter
as part of the original case), it turned out that, in fact, Det. Parrow had
tampered with the computer without permission prior to a clone drive being made.
Again, while the Prosection  was denying this tampering to the Court (purjury),
it was in the midst of trying to cover it up by replacing Det. Parrow -- the
one who tampered with the computer -- with Homeland Security Agent Ray.  The
Government did not tell Agent Ray that the computer was tampered with before
Bates-I, and (as he testified to in Bates-II) did his investigation without
knowledge of the tampering -- just that he was brought in at the last minute
to take over for the previous expert, resulting in his providing his final report
on the first day of the Bates-I trial. (Again, this matter is well detailed in
Mr. Bates' s.2255 appeal.)

    In sum, to the casual observer, the Government was prepared to go to trial.
But as later-discovered facts reveal, when the time for trial approached, the
Government was far from ready.  And as the replacement of Agent Ray happened
in the 10-day period prior to trial when Judge Moore prohibits continuations.
The Government's prosecution theory -- that nobody used the computer but Mr.
Bates -- was disproved from the information they obtained in the "secret Grand
Jury" -- and that the new, untainted expert (Agent Ray) would not have his
report done in time for trial (or so late it may excluded or result in a reversal
if allowed).  The Government needed more time, and they could not get a continu-

ation.  As a result, the Government filed a last-minute superceeding indict-
ment just a week before trial.  It was later presumed that this was an attempt
to force the Court to grant a continuation to the Defense to prepare for the
new allegations in the new indictment.  And normally, this would have succeeded.
But Judge Moore was steadfast in his 10-day/No continuation rule, and denied
the defense motion for one.  This led to the incredibly unusual act of the
Government moving for a continuation on behalf of the defense!  It, too, was
denied.

The Government, at this point, was going to trial in 5 days with an in-
complete expert's report, an undisclosed tampering with a computer, and also
undisclosed evidence of six (6) potential exculpatory witnesses who will admit
that they used the laptop in question, which would evicerate the entire Prosesu-
tion Theory.  And the Government did not know how much, if any, of this
information was known to the Defense.

After the Government presented its case, which was weak at best, the
Defense began calling witnesses.  The Government's redirects turned the trial
into an X-rated circus.  They asked every witness -- regardless of what the
direct was about -- if they engaged in sexual activity with Mr. Bates, and
described  in lurid detail those sex acts.  In one case of a 65 year old defense
witness who was openly homosexual and a member of a private online dating service
for gay men who are older, the government --using it subpoena power -- obtained
full access to the witness' account,    obtained nude and semi-nude photos of
him, and published them to the jury!  They disclosed an extra-marital affair
of Mr. Bates in lurid detail with photos (obtained, again, through subpoena of
email records dating back several years) that was not only long ended, but
totally irrelevant to the case.

All this and more was clearly an attempt to get a mistrial, and then
have time to properly prepare (or dismiss) the case against Mr. Bates.  But,
shockingly, Judge Moore allowed all of this over objections.  (The Eleventh
Circuit addressed this as well in it's opinion reversing the Bates-I conviction.)
So, the circus continued unabated.

Had Mr. Bates been properly provided all the exculpatory evidence on
the six users of the computer and the improper tampering of the computer
in a timely manner before Bates-I, and the Government did not use the improper
and prejudicial actions it did in Bates-I,  then the outcome of Bates-I may

not have happened at all.

Instead, the Government got a "dry run" at the trial. They learned that he did not, in fact, know about the six exculpatory witnesses who used the computer. They discovered he did not know about the tampering with the computer. (Although, the computer expert hired by the defense suspected it, but ran out of time to track down the details. This fact was also addressed by the Eleventh Circuit in its opinion.) They discovered exactly what the witnesses knew, and what they did not. They discovered what alibis he had good evidence to support, and which did not. (And they acted on that fact in Bates-II by removing counts for which he had compelling alibi support and keeping those that did not.)

By comparison, Mr. Bates was incarcerated during all of Bates-II. He was out of funds and could not re-hire his previous defense team of lawyers and experts, nor could the public defender afford them, or put forth the time or effort they did, simply because of the case load and financial limitations of his office. Many of the Defense witnesses were unavailable or deceased. Mr. Bates' wife was, in the time between trials, contacted by members of the St. Lucie Sheriff's Office (ex parte) who told her lurid, but untrue, stories about Mr. Bates' affairs. This, of course, led to her testifying poorly at trial. (The Defense did not learn of the ex parte communications until years later, and only after Mrs. Bates divorced Mr. Bates, in part due to these comments.)

The question by the Dissent -- "Why would the Government do it?" -- has a clear answer in hindsight: They wanted thier cake and eat it too. By intentionally engaging in improper behavior, the Government knew that if it was mistrialed or reversed on appeal, it would win in the re-trial because it would be better informed and better prepared against a much weaker prey.

This ancient combat strategy of combat, whether physical or legal, is foreclosed to the Government in crimianl cases by the Constitution. The Double Jeopardy Clause protects an individual against government actions that threaten or actually harass the accused through successive prosecutions. And in this case, Mr. Bates was on his THIRD time before the courts defending his "life and liberty": The first being not Bates-I, but the State case that preceded the federal ones.

In this case, the government intentionally engaged in a strategy that was intentionally designed to embarrass, harass, and weaken Mr. Bates. That strategy worked. Given the shocking manner of its improper strategy, that the

government obtained a guilty verdict in Bates-I was not a surprise.  As the
Eleventh Circuit opined, that the trial Court did not declare a mistrial was
surprising.  Nonetheless, the Appeals Court remedied that when it reversed and
remanded the case for retrial.  But as a result of this "mock trial" of Bates-I,
the government improperly gained valuable insight to the defense and exploited
it to their advantage in Bates-II.

And despite the advantages they had in Bates-II, it still wasn't sufficient
enough for them.  Instead of "playing fair" in the second trial, the government
continued to engage in the same misconduct, just in a lesser degree.  First,
the    Appeals Court found that that the Government relied on hearsay reports
so much, that the trial court abused its discretion by allowing them.  They also
repeatedly referred to Mr. Bates as a "big fish" and "worst of the worst" offender,
which the appeals court found not just to be untrue, but a continuation of the
slander from Bates-I.

If the government had respected Due Process, as well as fair play, then
Mr. Bates' first trial would have led to an acquittal (if not an outright with-
drawl of charges).  Although a Double Jeopardy through exhaustion of resources
per Oregon v. Kennedy. Id., usually arises from a mistrial, the underlying prin-
ciple applies equally well when a court of appeals reverses based upon prosecu-
torial misconduct, as the case here is. (Regardless if the misconduct is shelled
in judicial error.)

An appellate reversal for neutral judicial error casts one type of light
on a subsequent trial, but a different hue colors the situation where the ju-
dicial error valadates intentional government misconduct which should not have
happened in the first place.  (U.S. v. Dimitz, 424 US 600, 611 (1976).)

Mr. Bates did not raise this matter on direct appeal because the rarity
and novelty of such a Double Jeopardy action was unknown to him, and only brought
to his attention after his public defender sent him a letter telling him to
seek this relief by way of a s.2255 appeal.  (Of course, his failure to raise
it in direct appeal was also a ground of the s.2255 complaint.)  In an irony
that is sad for Mr. Bates, the trial court denied s.2255 relief on the matter
of Double Jeopardy because he was supposedly barred from raising it in a s.2255
because he failed to raise it first in a direct appeal.  The fact that his
public defender failed to do so, however, was not deemed ineffective counsel
by the same court.  As he was then denied a COA by the Eleventh Circuit and

Page 36

Supreme Court (Cert. Denied.).

This leaves him to this final avenue of relief.  Mr. Bates argues that
because Double Jeopardy -- a fundamental right which Mr. Bates did not
knowingly waive by participating in the Bates-II trial as he did not know
such an option was available to him -- is a viable option here because his
sentence is invalid since it is an extension or result of a trial that violated
the Constitutional protections of Double Jeopardy.

As such, Mr. Bates seeks that this court remand this case back for consider-
ation of if Double Jeopardy applies.

III.  GROUND THREE:  Mr. Bates' Sentence of the Statutory Maximum
of Twenty (20) Years of Incarceration Was Based, In Whole or Part,
Upon Inaccurate and/or Faslse Information as Determined by the
Eleventh Circuit Court of Appeals.

### Legal Standards.

18 USC 3553 states, in part, that a sentence shall be imposed which is
"sufficient, but not greater than necessary" and considers the "nature and
circumstances of the offense". Moreover, a "sentence on the basis of assumptions
concerning criminal record which were materially untrue [] whether caused by
carelessness or design, is inconsistent with Due Process of law, and such a
conviction cannot stand." Townsend v. Burke, 334 US 736, 741 (1948)

### Argument.

When Mr. Bates was sentenced, the Court gave little insight on how it
weighed his sentence against the 3553 factors when deciding to ignore a down-
ward departure from the guidelines. The Judge simply stated that he considered
the factors and found that 20 years was proper being a "middle sentence" albeit
at the statutory maximum. Without knowing how the judge treated each of the
guiding factors, Mr. Bates must try to speculate for each based on the facts
on the record. Leaving 3553(a)(1) for last, we consider subsections (a)(2)(A-D)
first:

3553(a)(2)(A) -- The need to reflect the seriousness of the offense, promote
respect for the law, and provide just punishment for the offense.

Mr. Bates' Criminal history shows that he had committed no prior crimes
and was repeatedly decorated for service and valor in serving his community in
law enforcement. He had just passed the Florida Bar exam, opea paralegal business
and was a dedicated family man. To put Mr. Bates in prison for any length of
time  would be a severe punishment for him. Moreover, due to the nature of his
offense (sex offender) and prior occupation in law enforcement, he would be a
phariah in prison, subject to abuse by fellow inmates and staff much more severe
than any other inmate. Mr. Bates' first five years in incarceration were at

the federal prison (low) at Beaumont, Texas. This was an "enhanced" security facility populated with hard-core criminals and gang members. Fights and assaults were daily occurences (even if undiscovered or un-reported by staff). This facility was known within the Bureau of Prisons as "Bloody Beaumont". Mr. Bates was subjected to both physical and sexual battery and assaults significantly worse and more frequently than inmates who were not sex offenders or law enforcement (much less both). Eventually, Mr. Bates was given a near-release transfer to Coleman (Florida) prison - a protective custody prison where he was no longer subjected to physical abuse (albeit, he's still harassed due to his sex offender status). There is no secret about the fact that sex offenders and former police will be at much greater risk of abuse in prison -- and Mr. Bates was both. So, given the fact that the Judge knew, or should have known, the fact that prison time for Mr. Bates would be much more severe for him than for an offender with other charges or prior employment, why did the Court still feel that the maximum of 20 years was still necessary?

Moreover, looking at the specifics of the offense, why was a 20-year sentence necessary? While Mr. Bates has, admittedly, limited law library access, he could find no case wherein a defendant was prosecuted with 110 images (like Mr. Bates). While Mr. Bates concedes that there is probably a few cases prosecuted with fewer files, did they receive the maximum sen-tence like Mr. Bates? Moreover, essentially every inmate Mr. Bates has served time with with greater numbers of images (often significantly greater) than Mr. Bates, or were charged with "hands-on" offenses (such as produc-tion or Mann Act charges) had significantly lesser sentences. Even B.O.P. staff who reviewed Mr. Bates' case for counseling and case management reasons were shocked over the time Mr. Bates received given the facts of the case. Interestingly, Judge Moore -- who sentenced Mr. Bates to the statutory maximum and permitted the Government to mis-characterize him as a "big fish and worst of the worst" -- had himself sentenced defendants with more serious offenses to lesser sentences than the statutory maximum. (US v. Staples, 2009 US Dist. LEXIS 81648, p.3 ("hundreds of images of child pornography"); US v. Searcy, 229 F.Supp. 2d 1285 (So. Dist. Fla, 2003) (Career offender, charged with child porn, exploitation, lewd and lacivious acts upon a child.).) Having seen these cases and presided over

these (and undoubtedly other) cases before Mr. Bates' case came before him, and still allow the characterization of a "worst of the worst" or "big fish" to stand, much less a statutory maximum sentence to be imposed, is problematic at best.  Absent a clear and unambiguous detailing how this sentence was fair, one can reasonably speculate that it was unfair.

Mr. Bates was not, by any reasonable standard, a "hardened criminal" or "repeat offender".  Moreover, the Eleventh Circuit made it clear that Mr. Bates' offense did not make him a "big fish", but rather that he was a de minimus offender in comparison to others with the same charges.  Therefore a reasonable person would find that the goals of 3553(2)(a) could have been achieved with a sentence significantly less than 20 years.

So, presuming that Judge Moore was acting reasonably, we must conclude that section (2)(a) was not the reason for a maximim sentence.


3553(2)(B) -- Affording Deterrence to Criminal Conduct.

Regardless of a prison term, Judge Moore knew -- or should have known -- that in addidtion to the 15 years of post-release supervision he will get under the federal government, he's also facing local and state supervision for life under the SORNA laws of Florida, which are some of the most strict in the nation.  This constant supervision by local, state, and federal authorities for life (except federal, which would continue until Mr. Bates is 88 years old), will be a much greater deterrent to crime than a maximum sentence will be.

Therefore, it cannot be presumed that "deterrence of criminal behavior" under section (2)(b) was the reason Mr. Bates received a maximum sentence.


3553(2)(c) -- Protecting the Public From Further Crimes of the Defendant.

Again, as in the discusson of section (2)(b), above, the same supervision by federal, state, and local authorities will provide a greater deterrence, as well as actual prevention and prohibition, of criminal conduct than a sentence will provide.

Again, the reason for Judge Moore's 20-year sentence must lie elsewhere than 3553(2)(c).

3553(2)(d) -- To Provide the Defendant with Needed Educational or Vo-
cational Training, Medical Care, or Other Correctional Treatment in the
Most Effective Manner.

Judges -- and most everyone else -- know that prisons do not "effectiv-
ely" rehabilitate people, if they do so at all.  Prisons, at best, warehouse
people away from "decent society".  At worst, they make criminals more
effective criminals upon release.  And prisons like Bloody Beaumont, where
Mr. Bates spent half a decade, are oftern referred to as "gladiator schools"
because they teach you to fight or die.  Not an especially effective skill
for reentry into society.

Any "rehabilitation" that this provision of the statute refers to
could be best achieved upon release from prison, and the sooner the better.

Therefore, section (2)(d) was not reasonably the grounds for Judge Moore
to impose the maximum sentence.


3553(A)(1) -- The Nature and Circumstances of the Offense, and the
History and **Character of the Defendant**. (emphasis supplied.)

As noted earlier, and as the record clearly reflects, Mr. Bates was
free of criminal conduct prior to the instant offense.  Therefore, "history"
of Mr. Bates should be irrelevent.  Moreover, as the Eleventh Circuit opined
and Judge Moore's prior cases demonstrated, Mr. Bates had a exceptionally
small amount of illicit materials on his computer.  (See, inter alia, US v.
Staples, Id.;  US v. Searcy, Id.; US v. Bates (Bates-I appeal), Id..)
Therefore, this leaves the character, nature, and circumstances of the
defendant and offense.  This is the area where the record conflicts with
the facts and the opinion of the Eleventh Circuit.

Not only did the Government and their witnesses claim that Mr. Bates
was a "Big Fish" and "Worst of the Worst" offender, they hammered it upon
the Court and jury.  And the Court must have believed it as true, because
they allowed the Government and their witnesses to make that characterization
dozens of times over objections of the Defense.  (Clearly, a "reasonable
judge" would never allow such a characterization unless he felt it was an
accurate characterization.  The only other possibility would be that the
judge allowed it, knowing full well it was inaccurate and prejudicial, to
assist the Government on obtaining a conviction.  This claim was made by

by experience attorneys (see affidavit in support of s.2255 relief,
Bates v. US, Id, DE-10, as well as in the Criminal case in pretrial
motions, denied by Judge Moore claiming he was completely impartial)
but is not being made, in arguendo, to presume that this matter was given
proper 3553 consideration by Judge Moore.

In analysis, Mr. Bates recognizes that child pornography is a
serious crime, and even a single image is rightfully a crime.  But as
with any crime, there must be a range of severity with punishments that
vary based on the severity.  Nobody would find that having a baggie of pot
should get the same punishment as someone with a pound, or a ton.  Yet,
here is Mr. Bates who has what the Court of Appeals recognizes as a minimal
amount of illegal material getting the same, maximum sentence one would
get if he/she had tens-of-thousands of images.

But Judge Moore had to be aware that, comparitively, Mr. Bates'
quantity of materials was orders of magnitude less than most offenders,
including (presumably) every other person whose case he presided over for
the same offense.  Therefore, the quantity of the materials cannot be the
reason for the maximum sentence.  Moreover, the Government admitted that
Mr. Bates did not distribute, trade, buy, sell, or produce any illicit
materials.  In fact, both Agent Ray and Det. Valentine (reluctantly) had
to admit on the record that there was no evidence whatsoever that refuted
Mr. Bates' alibis or put Mr. Bates behind the computer at the time of the
alleged illegal activity.

Accordingly, one is asking what single element of Mr. Bates' case
would uniquely make Judge Moore give Mr. Bates the maximum sentence possible?
Simple:  He believed the Government's characterization that Mr. Bates was
"the worst of the worst" and "a big fish".  Under the 3553 factors, it would
easily permit Mr. Moore to impose the statutory maximum sentence.  Which he
did.

**Unfortunately, the characterization by the government that Judge Moore
relied upon was untrue.**

The Supreme Court in Townsend v. Burke, 334 US 736 (1948) held that a
"sentence on the basis of assumptions concerning [a] criminal record which
were materially untrue [] whether caused by carelessness or design, is
inconsistent with due process of law, and such a conviction cannot stand."

Therefore, if every 3553 factor except one would lead a reasonable person to give a low-end sentence or downward departure, and that single exception was later found to be <u>wrong</u>, than the sentence must be reconsidered.

Because the Court failed to give a detailed breakdown of how it reached its sentencing decision in accordance with the 3553 factors, or how the characterization of Mr. Bates being a "big fish" or "worst of the worst" factored into it, brings the entire sentencing phase of the trial into question.  Especially after the Eleventh Circuit found that such a damning characterization of Mr. Bates was found later to be false, the matter must be reconsidered.

According, Mr. Bates seeks to have a new sentencing hearing conducted taking into consideration the Eleventh Circuit's post-sentence finding that Mr. Bates was grossly mischaracterized as a "big fish" and "worst of the worst" when, in fact, he was a de minimus offender.



Tampa/St Pete FL
MON 21 MAR 202

Cameron Dean Bates
00407-104
Federal Correctional Complex - low
PoBox 1031
Coleman, FL 33521

SCREENED
By USMS

Clerk of the Court
United States District
207 N.W. Sec
Suite 337
Ocala, FL 3